UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

LINDA SARACENI,

                              Plaintiff,

                                                                    5:21-CV-0936
v.                                                                  (GTS/TWD)

CHARLES P. RETTING, Commissioner,
Department of Treasury (Internal Revenue
Services),

                              Defendant.

_____

APPEARANCES:                                    OF COUNSEL:

SOUTHWORTH PC                                   GEORGIA A. LAWRENCE, ESQ.
     Counsel for Plaintiff
1100 South Peachtree Street NE, Suite 200
Atlanta, GA 30309

SMITH, SOVIK, KENDRICK & SUGNET, P.C.           STEVEN W. WILLIAMS, ESQ.
     Co-counsel for Plaintiff
250 South Clinton Street, Suite 600
Syracuse, NY 13202-1252

CARLA B. FREEDMAN                               KAREN FOLSTER LESPERANCE, ESQ.
OFFICE OF THE UNITED STATES ATTORNEY
     Counsel for Defendant
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, NY 12207-2924

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment discrimination action filed by Linda

Saraceni ("Plaintiff") against Charles P. Retting in his capacity as Commissioner of the

Department of Treasury (Internal Revenue Service) ("Defendant"), is Defendant's motion for

summary judgment pursuant to Fed. R. Civ. P. 56.   (Dkt. Nos. 32.)   For the reasons set forth

below, Defendant's motion is granted and Plaintiff's Complaint is dismissed.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Complaint

Generally, in her *pro se* Complaint,[1]  Plaintiff collectively asserts seven claims, some of

which are based on the same theory but brought pursuant to different statutes.   (Dkt. No. 1.)

First, Plaintiff claims that Defendant violated the Rehabilitation Act by misleading her about

reasonable accommodation options and failing to reasonably accommodate her disability in a

manner that was so intolerable that she was compelled to retire and was therefore subjected to a

constructive discharge (hereinafter Claim One).   (*Id.* at ¶¶ 78-83.)

Second, Plaintiff claims that Defendant retaliated against in her violation of Title VII and

the Rehabilitation Act for both filing a harassment complaint that she reasonably believed was

opposing sex harassment (as to Title VII) and disability harassment and making requests for

reasonable accommodations related to her disability (as to the Rehabilitation Act) (hereinafter

Claims Two and Three, respectively).   (*Id.* at ¶¶ 84-91.)

Third, Plaintiff claims that Defendant subjected her to a hostile work environment in the

form of unwelcome conduct that was severe and/or pervasive and/or would have dissuaded a

reasonable person from engaging in protected activity based upon her disability in violation of

the Rehabilitation Act, and in retaliation for her protected activity in violation of Title VII and

the Rehabilitation Act (hereinafter Claims Four, Five, and Six, respectively).   (*Id.* at ¶¶ 92-100.)

Fourth, Plaintiff claims that Defendant failed to accommodate her disability in violation

---

[1]      Although Plaintiff drafted and filed her Complaint in a *pro se* capacity, she has since
retained counsel, and her counsel was involved in the drafting of her papers related to the current
motion.   (Dkt. Nos. 1, 12, 13, 14, 15, 33.)

of the Rehabilitation Act (hereinafter Claim Seven).   (*Id.* at ¶¶ 101-06.)

      **B.**     **Undisputed Material Facts on Defendant's Motion for Summary Judgment**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendant, and either expressly admitted or denied without a supporting record citation by Plaintiff.

      1.     Plaintiff began working for the IRS in 1985 as a field agent.

2.      After 22 years as a field agent, Plaintiff became a Senior Reviewer in the pension plan division of the IRS' Mandatory Review Group.[2]

3.      In 2018, Plaintiff was a GS-13 Senior Reviewer, meaning that she was a Grade 13 on the General Services pay scale for federal employees.[3]

4.      In her role as a Senior Reviewer, Plaintiff was responsible for reviewing and correcting pension plan audit cases conducted by field agents that were "unagreed," working with IRS counsel to make changes and perfect the cases for their eventual use in tax court.[4]

5.      From the time she joined the Mandatory Review group until February 2018, David Boyd was Plaintiff's direct supervisor.

6.      The employees in the mandatory review group all had different duty stations. David Boyd's duty station was in Nashville, Tennessee, along with several other members of the mandatory review team.   Others were located in Florida, New York City, and Dallas, Texas, and Plaintiff was located in Syracuse, New York.   Plaintiff was the only member of the Mandatory

---

[2]      Plaintiff purports to admit this fact in part and deny it in part; however, her denial amounts to little more than the addition of non-material or extraneous facts.   *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 326 (N.D.N.Y. 2021) (Hurd, J.) (noting that a response to the movant's Statement of Material Facts is not the proper place to add additional facts); *Boger v. New York State Office of Parks, Recreation & Historic Preservation*, 17-CV-0289, 2019 WL 2766897, at *2 (N.D.N.Y. July 2, 2019) (D'Agostino, J.) (disregarding the party's introduction of immaterial facts and legal argument when responding to asserted facts).   This asserted fact is therefore deemed to be admitted.

[3]      Plaintiff disputes Defendant's characterization of her as a GS-13 Senior Reviewer, asserting that she was more properly characterized as being at the level of GS-0512-13.   (Dkt. No. 33, Attach. 6, at ¶ 3.)   It is not clear that this distinction is material to the issues to be determined in this case.

[4]      The Court agrees with Plaintiff that Defendant's characterization of her job duties is perhaps slightly different that her testimony on which Defendant relied.   (Dkt. No 32, Attach. 5, at 19-21.)   The asserted fact has therefore been altered to more closely track Plaintiff's testimony on this matter.

4

Review group located in Syracuse.   The IRS maintained an office in Syracuse, but Plaintiff worked from home most of the time.

7.      At a town hall meeting with impacted employees in early February 2018, the IRS announced a reorganization of the Employee Plans Division.   Some divisions were eliminated or consolidated, and some managers were moved.   As part of this reorganization, George Brim became the manager of the Mandatory Review group.

8.      There were concerns and speculation amongst some employees including Plaintiff that the Employee Plans Division may get rid of the Mandatory Review group, or that the mandatory reviewers may be sent to field groups or be given multiple duties.

9.      On February 12, 2018, a retirement specialist with the IRS sent Plaintiff an email confirming the submission of Plaintiff's retirement paperwork for a retirement date of June 30, 2018.[5]

10.     On February 20, 2018, Plaintiff emailed the retirement specialist and indicated that she would not be retiring on June 30, 2018.   She noted, however, that "[i]t is something I am considering due to health concerns and the ageing of my mother and the reorganization of my unit."

11.     The changes made in the reorganization became effective and George Brim became the manager of the Mandatory Review group and Plaintiff's first-line supervisor effective February 17, 2018.

12.     Michael Sanders, who was then the Area Manager for the Mid-Atlantic region,

---

[5]      Plaintiff disputes this asserted fact but, rather than showing the asserted fact is actually disputed, she admits that she received such an email after submitting her paperwork, and merely adds facts to the effect that her submission of retirement paperwork at that time was the result of an accident on her part.   (Dkt. No. 33, Attach. 6, at ¶ 9.)   The Court takes note of this additional fact, which does not appear to be disputed, for the purposes of context, but finds that the asserted

became Plaintiff's second-line supervisor.

13.     At some point in February 2018, Mr. Brim and Mr. Sanders met with Mr. Boyd and other members of the Mandatory Review group for two days in Nashville, Tennessee.

14.     Plaintiff was not present for the meeting in Nashville.

15.     On March 14, 2018, Plaintiff emailed Mr. Brim stating that she was finishing a "30 day letter package" that was a "typical representation of the cases that we get here in mandatory review," and asked if he would like to review it.   He agreed and she sent it to him for his review on March 15.

16.     The 30-day package that Plaintiff sent to Mr. Brim on March 15, 2018, was the first such package that Mr. Brim was reviewing since moving to Mandatory Review.

17.     Mr. Brim called Steven Shearer and asked if he would also look at the 30-day letter package to provide feedback to Mr. Brim, given that it was his first time reviewing one.

18.     Mr. Shearer was a lead reviewer, and one of his responsibilities in that role was to review 30-day packages.

19.     Mr. Brim emailed the 30-day package to Mr. Shearer on Friday, March 16, 2018, and told Mr. Shearer that he "[a]ppreciate[d] the mentoring."

20.     On Monday, March 19, 2018, Mr. Brim sent his proposed feedback on the 30-day package to Mr. Shearer and asked Mr. Shearer for his thoughts.

21.     On Thursday, March 22, 2018, Mr. Shearer sent his feedback to Mr. Brim, and they discussed by telephone on Friday, March 23.

22.     On March 23, 2018, Mr. Brim sent Plaintiff his comments and edits to the 30-day package and included "a write-up of my review of the work done."

_____

fact is also not disputed and has been deemed to be admitted.

23.     The write-up provided comments and a rating for each of Plaintiff's critical job elements and was intended to let Plaintiff know how Mr. Brim would have evaluated her work if he was scoring it as a case review.

24.     In this non-evaluative review, Mr. Brim provided a rating for four critical job elements; he rated her work as "fully successful" for one element, "exceeds fully successful" for two elements, and "outstanding" for one element.

25.     Later that night, Plaintiff sent Mr. Shearer an email stating, "You reviewed my case for George and gave him input."

26.     Mr. Shearer responded on Saturday, March 24, acknowledging that Mr. Brim had asked him to look at it, and he also stated that Mr. Brim had reviewed it himself before Mr. Shearer had sent Mr. Brim his suggested edits.[6]

27.     Mr. Shearer point out that Mr. Brim's write-up was dated before Mr. Shearer's conversation with Mr. Brim, to which Plaintiff responded, "That is really underhanded and we both know that it is not true."

28.     Less than 24 hours after receiving Mr. Brim's feedback to her 30-day package, Plaintiff emailed the IRS retirement specialist, stating that she "may be retiring after all. Unfortunately, I am dealing with some harassment/bullying issues that I had hoped would have worked themselves out . . . but they did not.   The stress from this is literally making me ill.   Can we set up a time to talk so we can go over my paperwork."

29.     Also on March 24, Plaintiff emailed William Dolce, the Area Manager for the

---

[6]     Plaintiff admits this asserted fact in part and denies it in part, but, again, her denial is less a denial than the addition of other facts.   (Dkt. No. 33, Attach. 6, at ¶ 26.)   *See LaFever*, 525 F. Supp. 3d at 326; *Boger*, 2019 WL 2766897, at *2.   Further, Plaintiff does not cite any record evidence in support of this supposed denial.   (*Id.*)   The asserted fact is therefore deemed to be admitted.

Northeast Area.   In that email, she stated that it was "quite clear from the way we are being treated that they have no intention to keep this group [Mandatory Review] intact."   She stated that she was putting in her retirement papers as she was eligible to retire at the end of June, but asked if Mr. Dolce could let her know if he had any positions coming available in his area.

30.     On the evening of March 25, Plaintiff emailed Mr. Brim saying that she had been ill all weekend and would be taking sick leave on Monday.

31.     At 10:00 p.m. that night, Plaintiff sent Mr. Brim a two-page email with the subject line "Clarification of the IRS/Harassment/Bullying Policy," with a copy to Mr. Sanders, who was the area manager and Mr. Brim's supervisor.

32.     In that email, Plaintiff stated that it was "clearly evident" that Mr. Shearer had provided Mr. Brim with his notes/input on her 30-day package, "and while you as Group Manager have every right to use the Lead Reviewer to review my work I think it is dishonest to not tell me that."

33.     Plaintiff also stated that her prior supervisor, Mr. Boyd, had put in place an arrangement in which Mr. Shearer did not review Plaintiff's work.   Plaintiff contended that Mr. Boyd had told Mr. Brim about this arrangement during the transition meeting in Nashville.

34.     Attached to that email was Mr. Brim's write-up of his review of the work done on the 30-day package, which Plaintiff referred to throughout the email as a "Random Case Review," with Plaintiff's comments and responses embedded.

35.     Plaintiff stated that, if Mr. Brim shared her embedded comments and responses in the attachment with Mr. Shearer, she would deem that to be "unethical" and would consider it "a separate and additional act of harassment and that your intention is to promulgate such

harassment in the workplace."

36.     Plaintiff opined that Mr. Brim's actions in asking Mr. Shearer to review her 30-day package made clear to her that Mr. Brim had "no intentions" of "respect[ing] [her] right to work in an environment free of fear of reprisal or verbal harassment or bullying."

37.     Plaintiff demanded that Mr. Brim provide her with a written explanation of why Mr. Brim did not "honor the arrangement" she had with her prior supervisor.

38.     Approximately 30 minutes later, at 10:30 p.m., Plaintiff sent another email to Mr. Brim with a copy to Mr. Sanders.

39.     In the second email, Plaintiff criticized Mr. Brim for what she deemed to be a "Random Case Review."   She stated that she was "shocked and dismayed," that it was unfair of Mr. Brim to write up a review of her work, and that the Review was "mean spirited and unprofessional."

40.     Plaintiff told Mr. Brim that his review of her 30-day letter package resulted in a "complete loss of trust" between her and Mr. Brim.

41.     Plaintiff again stated that it was "dishonest" and an act of harassment/bullying to have Mr. Shearer review her 30-day package.

42.     Plaintiff was on sick leave on Monday, March 26.

43.     Plaintiff obtained a doctor's note on March 26, which stated that she would be out of work until April 12 due to unspecified "medical reasons."

44.     On March 27, Mr. Brim spoke to Plaintiff on the telephone.   He explained that, because this was the first 30-day letter he had reviewed, he wanted review and feedback from Mr. Shearer.   He apologized for not having made clear that his write-up of her 30-day letter was

non-evaluative and would not count towards her annual appraisal rating.[7]

45.     After the phone call, Mr. Brim reiterated these points in an email to Plaintiff and also responded to some of her concerns about the non-evaluative review of her 30-day package.

46.     Also on March 27, Plaintiff forwarded to Sean O'Reilly (who was the Acting Director of the Employee Plans Division) the two Sunday night emails she had sent to Mr. Brim and Mr. Sanders.

47.     In her email to Mr. O'Reilly, Plaintiff stated that the agreement she had with her prior supervisor to not have Mr. Shearer review her work was an "accommodation" put into place to address harassment/verbal abuse/bullying by Mr. Shearer.

48.     Plaintiff told Mr. O'Reilly that her new manager was not honoring this accommodation, so she asked him for an explanation as to why the IRS policy on harassment and bullying was not being upheld.

49.     Plaintiff also stated that she had contacted her union representative, Equal Opportunity Employment ("EEO"), and "a Civil Service Attorney."

50.     Plaintiff further stated that the stress caused by this was aggravating her health issues, leaving her "no option but to retire much earlier than planned."

51.     Mr. O'Reilly responded the following morning, March 28, stating that he would speak to the Area Manager (Mr. Sanders) and work on a "path forward."

52.     Mr. Sanders informed Mr. O'Reilly that he had a scheduled call with Plaintiff later that morning and would update Mr. O'Reilly after the call.

53.     Mr. Sanders had a lengthy call with Plaintiff later that morning.

---

[7]     Plaintiff disputes this fact, but, again, this denial is essentially the assertion of unrelated facts.   (Dkt. No. 33, Attach. 6, at ¶ 44.)   *See LaFever*, 525 F. Supp. 3d at 326; *Boger*, 2019 WL 2766897, at *2.   This asserted fact is deemed to be admitted.

54.     During that call, she asked if she could be moved into a different group but continue to do mandatory review work, and Mr. Sanders responded no.

55.     It was not possible for Plaintiff to continue to do mandatory review work in a different group, because Mr. Brim was the only manager who had program oversight responsibility over mandatory review.   Plaintiff's mandatory review work could not be managed, supervised, and reviewed by a manager who did not have program oversight responsibility.

56.     Also on March 28, Plaintiff again emailed Mr. Dolce, the Northeast Area Manager.

57.     In a lengthy two-page email, Plaintiff explained to Mr. Dolce her concerns with the reorganization and new management of the Mandatory Review group, namely the widespread fear and concern that the Mandatory Review group would be disbanded, as well as rumors that no one in the Mid-Atlantic area was allowed to receive "all 5's" on their annual appraisals (with five being the highest rating in a given category).

58.     Later the same day, Plaintiff emailed Mr. Dolce again, informing him about her conversation with Mr. Sanders and his rejection of her request to do mandatory review work in another group.

59.     In the same email, Plaintiff also informed Mr. Dolce that she had spoken to the Anti-Harassment Unit that morning, that a formal harassment inquiry is a process that would "go one step above Sean O'Reilly," that everyone would be interviewed, and that it would "make the Service look bad," be bad for morale, and be "a waste of Government time, money, and effort if there is a means to settle this where all parties feel accommodated."   She concluded by stating

11

that she had to sign the formal harassment inquiry by Friday if she was going to, and invited a discussion if "there is an alternative way to work this out."

60.      Mr. Dolce forwarded all three of Plaintiff's emails to Mr. Sanders and Mr. O'Reilly.

61.      On or about March 28, Plaintiff filed a formal harassment complaint against Mr. Brim and Mr. Sanders.

62.      On April 6, 2018, Plaintiff extended her sick leave an additional two weeks and provided a doctor's note that simply stated "unable to work 3/29-4/26/18" with no further information.

63.      On May 16, 2018, a Management Inquiry into Plaintiff's allegations of harassment was completed, and a report was generated dated May 21, 2018.

64.      This Inquiry found that Plaintiff's harassment allegations were not substantiated.[8]

65.      On or about June 14, 2018, Cathy Jones contacted Plaintiff by phone and informed her that the Management Inquiry was complete, and that the allegations of harassment had not been substantiated.

66.      On June 15, 2018, Plaintiff provided another doctor's note stating that she was "unable to work due to medical illness 6/15-6/29/2018."

67.      Also on June 15, Mr. Brim was copied on an email from Human Resources to Plaintiff acknowledging receipt of her retirement application package.

68.      Mr. Brim forwarded the email to Plaintiff on June 17 to ask if she was retiring and, if so, if she had selected a date.

---

[8]      Plaintiff disputes the asserted fact, but, rather than being a proper dispute, Plaintiff adds facts and arguments regarding why she believes the inquiry into her harassment complaint was biased.   (Dkt. No. 33, Attach. 6, at ¶ 64.)   This asserted fact is therefore deemed to be admitted.

69.     Plaintiff did not respond to this email.   Mr. Brim forwarded the email to her again on July 6, 2018, asking for her retirement date.   Plaintiff responded by stating that she had tentatively filed her paperwork to retire effective August 31, 2018, but that she was "working with Cin Dee Dunn on some options."

70.     On July 12, 2018, Plaintiff emailed Mr. Brim regarding various items "in preparation for retirement," such as returning documents and equipment.

71.     Also on July 12, Plaintiff submitted a "Request for Reasonable Accommodation" seeking to be moved to either Classifications or EPCU (other groups within the IRS) to do her mandatory review work within those groups.

72.     The Acting Manager assigned a case number and assigned the case to Carol Minters as Reasonable Accommodation Coordinator ("RAC").   Ms. Minters arranged a call with Plaintiff to discuss the process.   Ms. Minters also requested supporting medical documentation, which Plaintiff provided.

73.     On July 18, 2018, Ms. Minters discussed the request and the process with Mr. Brim, Mr. Sanders, and Mr. O'Reilly.   During the meeting, it was determined that the Department of Health and Human Services would be asked to complete a Federal Occupational Health ("FOH") assessment.

74.     On July 30, 2018, Mr. Minters held a first joint meeting to discuss the reasonable accommodations request.   In attendance at the meeting were Ms. Minters, Mr. Sanders, Plaintiff, and Plaintiff's union representative Lisa Bates.

75.     Mr. Sanders explained that Plaintiff's request to do mandatory review work in Classifications or EPCU was not feasible because he does not have control over Classifications

or EPCU.   He asked whether Plaintiff could be a revenue agent as an alternative accommodation.

76.     Ms. Minters explained that the goal of the interactive process was to find an effective accommodation that would allow Plaintiff to perform her job and that reassignment would be considered only as a last resort.

77.     During the meeting, it was determined that the Department of Health and Human Services would be asked to complete a FOH assessment.

78.     Also during that meeting, there were discussions about potential interim accommodations that could be put in place while the FOH assessment was being conducted, which was expected to take approximately six weeks.

79.     No interim accommodations were agreed upon at the meeting.   Mr. Sanders inquired as to whether Plaintiff would want to move to Mr. Dolce's group as a revenue agent because of her previous communications with Mr. Dolce.

80.     However, Plaintiff had raised concerns about her ability to travel and/or drive long distances, which caused Mr. Sanders to be concerned about whether that would be an appropriate accommodation for her.

81.     Ms. Minters gathered the necessary releases, forms, and information and submitted the request to FOH on August 13, 2018.

82.     Also on August 13, Mr. Sanders provided Ms. Minters with information required for the FOH assessment.   In an email, he also offered to meet with Plaintiff for 15-30 minutes to offer her a temporary reassignment to a position as a revenue agent in the Northeast Area until further guidance was received from FOH.

83.    Another joint meeting was conducted on August 15 with Plaintiff, Ms. Bates, Ms. Minters, and Mr. Sanders.

84.    Ms. Minters suggested as a temporary accommodation that Plaintiff sit down with Mr. Brim and attempt to work out their issues.

85.    It was also discussed that Plaintiff could stay in her position until the FOH assessment was completed and, if during that time Mr. Brim engaged in behavior that caused her stress, Ms. Bates could intervene and address the behavior with Mr. Brim.

86.    During this meeting, Mr. Sanders again offered that Plaintiff could be moved to a position as a revenue agent as an interim accommodation.

87.    On August 15, 2018, Plaintiff agreed to a temporary reassignment as an interim accommodation as a field agent, to be effective August 20, 2018.[9]

88.    Later that day, Plaintiff emailed Mr. Brim to ask where to send her cases because she would be moving to a different group.

89.    Plaintiff took sick leave on August 16, 2018.

90.    On August 17, 2018, Plaintiff emailed Mr. Dolce and Mr. Waters stating, "I guess I will be filing my retirement papers . . . It would be stupid to waste your time and the Service[']s time and money to start a job that I will not stay in."

91.    Mr. Waters had a telephone call with Plaintiff on August 17, in which she reiterated her intent to retire.

92.    On Saturday, August 18, 2018, Plaintiff sent Mr. Waters and Mr. Dolce a lengthy

---

[9]    The Court agrees with Plaintiff that the undisputed evidence establishes that, although Plaintiff had verbally expressed assent to a reassignment as a field agent, she had not yet been informed that the assignment would specifically be in the Northeast Area under Mitchell Waters. (Dkt. No. 32, Attach. 41, at 2; Dkt. No. 32, Attach. 43, at 3; Dkt. No. 32, Attach. 46, at 2.)   The asserted fact has been modified to reflect this undisputed evidence.

email in which she claimed that she had not actually accepted the interim assignment that Mr. Sanders had offered her, that she had "no desire" to be a field agent, and that she wanted to continue to work at home on her claims cases, but be placed in Classifications or EPCU.   She asked if Mr. Waters saw a way for her to utilize her skills in mandatory review and claims without becoming a field agent.   She indicated that she would retire if being a field agent "was her fate."   She stated that she had previously submitted paperwork to retire as of August 31, 2018, and had emailed her retirement specialist the prior day to inquire whether she could still be processed out by August 31 if she sent the signed forms by overnight mail on Monday.   She stated that she might need to move her retirement date to September 30, 2018.

93.     Ms. Minters, upon seeing Plaintiff's emails from August 17 and August 18, discussed them with her manager and they determined they would notify management that Plaintiff believed the interim accommodation may cause her harm.   Management agreed to maintain the status quo, forego the interim accommodation, and wait for the FOH assessment.

94.     On August 22, 2018, Plaintiff was informed that she would stay in mandatory review until the FOH assessment was completed.

95.     After being informed of this, Plaintiff sent Mr. Brim and Mr. Sanders an email, copying Ms. Minters, in which she said, "Do not bother to send my cases back to Philly.   I will be off for the next week on medical leave and then I am done."

96.     That night, Plaintiff sent an email to the Mandatory Review group (excluding Mr. Brim), stating that "tomorrow will be my last day working for the IRS.   I will be on medical leave through 8/31/2018."

97.     Plaintiff submitted a doctor's note that she was unable to work.

98.     On August 27, 2018, Plaintiff's reasonable accommodation representative emailed Mr. Sanders and requested a call "to discuss what interim accommodations are still available to [Plaintiff]."

99.     On August 30, 2018, Plaintiff accepted a temporary interim assignment to the Northeast Area as a field agent, supervised by Mr. Waters.

100.    On September 12, 2018, Plaintiff again submitted her retirement papers with an effective date of September 30, 2018, and informed Mr. Waters by email that she would be retiring at the end of the month.

101.    Ms. Minters followed up with FOH on September 19, 2018.

102.    The Department of Health and Human Services completed the FOH assessment on September 21, 2018.

103.    The FOH assessment concluded that stress and anxiety exacerbate Plaintiff's medical conditions, that Plaintiff "finds working for her current manager stressful and anxiety-provoking," and that "working for a different manager would remove the stress of working for her current one."

104.    However, the FOH assessment concluded that this was a "work relationship" issue, which would be "appropriately addressed as an administrative matter, rather than through the disability process."[10]

105.    On September 25, 2018, Ms. Minters received the FOH report from the Department of Health and Human Services and provided a copy to Plaintiff and a redacted copy to management.

---

[10]     Plaintiff disputes this asserted fact but her denial is merely a disagreement with the conclusions of the assessment, not one supported by evidence disputing the asserted fact.   (Dkt. No. 33, Attach. 6, at ¶ 104.)   This asserted fact is therefore deemed to be admitted.

106.    Ms. Minters attempted to schedule a joint meeting to discuss the FOH report but was informed that Plaintiff had retired effective September 29, 2018.

107.    Plaintiff did indeed retire effective September 29, 2018.

108.    On December 12, 2018, Plaintiff contacted an EEO counselor to initiate the pre-complaint process.

109.    On April 4, 2019, Plaintiff filed a formal complaint of discrimination.

110.    On August 8, 2019, the Department of Treasury issued a Final Agency Decision, finding no discrimination.

111.    On September 12, 2019, Plaintiff filed an appeal with the Merit Systems Protection Board.

112.    On October 8, 2019, her appeal was dismissed without a hearing.

### C.    Parties' Arguments on Defendant's Motion for Summary Judgment

#### 1.    Defendant's Memorandum of Law

Generally, in his motion for summary judgment, Defendant makes three arguments. (Dkt. No. 32, Attach. 1.)   First, Defendant argues that he is entitled to summary judgment on Plaintiff's claims based on a hostile work environment and constructive discharge because the undisputed evidence shows that she did not suffer any conduct that was sufficiently severe and pervasive to alter the terms and conditions of her employment or to compel a reasonable person to resign, and because there is no evidence to show that any conduct directed at her by Defendant occurred because of her gender, disability, or protected activity.   (*Id.* at 10-18.)

Second, Defendant argues that he is entitled to summary judgment on Plaintiff's retaliation claims for two reasons: (a) her complaint about harassment does not constitute

protected activity because the alleged harassment was not based on her gender or disability and the undisputed evidence establishes that even Plaintiff did not view it as motivated by her disability or gender at the time she made the complaint, and (b) she has not established the existence of an adverse employment action because the conduct she was subjected to did not change the material terms or conditions of her employment or create an environment that reasonably necessitated her choice to resign from her employment.   (*Id.* at 18-20.)

Third, Defendant argues that he is entitled to summary judgment on Plaintiff's remaining failure-to-accommodate claim because Plaintiff has not shown either that (a) her medical conditions constitute a disability that Defendant was required to accommodate because it was only her interactions with her specific manager, not anything about her work, that allegedly exacerbated her medical conditions, or (b) that she was denied any accommodation (much less a reasonable one) given the undisputed fact that she voluntarily retired from her relevant job while the interactive process was still ongoing (i.e., before the FOH assessment regarding any reasonable accommodation was completed).   (*Id.* at 20-25.)   Defendant also argues that he was not required to provide Plaintiff with a new supervisor as a reasonable accommodation.   (*Id.* at 22-23.)

### 2.      Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff makes six arguments.   (Dkt. No. 33.)   First, Plaintiff argues that the applicable standard for Title VII and Rehabilitation Act claims involving federal government employees was altered by the Supreme Court's decision in *Babb v. Wilkie*, 589 U.S. 399 (2020), such that "any hint of discrimination, regardless of other legitimate reasons, may constitute a violation of 42 U.S.C.A.

§ 2000e-16(a)."   (*Id.* at 2-3.)

Second, Plaintiff argues that she has raised at least a genuine dispute of material fact regarding the existence of conduct by Defendant that was so severe and pervasive as to alter the terms and conditions of her employment based on evidence that her supervisors continuously harassed her in the form of extra scrutiny, demeaning and criticizing her work, shouting, making snide remarks, engaging in intimidating behavior, and making false accusations against her.   (*Id.* at 3-5.)   She further argues that Mr. Brim engaged in such conduct despite being aware that her medical conditions were exacerbated by stress, and that the failure to engage in a good-faith interactive process to assess reasonable disability accommodations also represents an action that altered the terms and conditions of her employment.   (*Id.*)   She also argues that Defendant retaliated against her after she requested accommodations by placing her in positions that were inconducive to her medical restrictions, misleading her regarding her options, and making false accusations and threats against her in a manner that required her to retire in order to protect her health.   (*Id.*)

Third, Plaintiff argues that there is at least a genuine dispute of material fact as to whether the harassment she suffered was based on her gender and/or disability because the evidence shows that (a) Mr. Brim and Mr. Sanders "exhibited an apparent bias against women, with Brim frequently upsetting female employees while treating male colleagues with respect," (b) Mr. Brim called Plaintiff "unhinged," a word that she asserts is "indicative of sexist stereotyping," (c) other women who Mr. Brim and Mr. Sanders managed experienced similar harassing treatment, and (d) Defendant, through Mr. Brim and Mr. Sanders, knew of her medical condition (and the fact that it was exacerbated by stress) but placed her in stressful situations and

failed to provide reasonable accommodations to alleviate that stress.   (*Id.* at 5-8.)   Plaintiff also argues that it is inappropriate to consider her gender or disability in isolation, but they should instead be viewed intersectionally.   (*Id.* at 7-8.)

Fourth, Plaintiff argues that her own testimony that the harassment might "possibly" be based on her gender creates a genuine dispute of material fact as to whether her complaints of harassment constitute protected activity, and that it is well settled that requesting reasonable accommodations is a protected activity.   (*Id.* at 8.)

Fifth, Plaintiff argues that the evidence creates at least a genuine dispute of material fact regarding her failure-to-accommodate claim because (a) there is no per se rule that a new supervisor cannot be a reasonable accommodation and Defendant's failure to even consider it as an option was a violation of the requirement to engage in an interactive process, and (b) Defendant generally failed to engage in a good-faith interactive process by denying interim positions proposed by the Plaintiff and instead offering her an interim position that was not conducive to her disabilities before subsequently taking even that interim position away from her without explanation.   (*Id.* at 9-12.)

Sixth, Plaintiff argues that there is at least a genuine dispute of material fact as to whether she was constructively discharged from her job due to intolerable working conditions including denials of her requests for time off, disregarding her medical documentation and leave requests, and frustrating the interactive process, all of which left her with no viable option to protect her health other than retiring.   (*Id.* at 12-13.)

### 3.   Defendant's Reply Memorandum of Law

Generally, in his reply to Plaintiff's opposition, Defendant makes five arguments.   (Dkt.

No. 37.)   First, Defendant argues that much of Plaintiff's "evidence" to defeat summary judgment should be disregarded because it is little more than conclusory assertions of fact without citation to record evidence, and her responses to Defendant's Statement of Material Facts in large part fails to comply with this Court's Local Rules.   (*Id.* at 3-6.)

Second, Defendant argues that *Babb* does not clearly apply to this case, because it involved only claims brought under the Age Discrimination in Employment Act ("ADEA"), a statute that is not at issue here.   (*Id.* at 6-8.)

Third, Defendant argues that he is entitled to summary judgment on Plaintiff's hostile-work-environment and constructive-discharge claims because (a) Plaintiff has not provided any explanation as to why the cases cited in his opening memorandum do not undermine her claims and offers no contrary authority to support her conclusory assertions, and (b) she offers no evidence to raise even a genuine dispute of fact that the complained-of conduct was because of her gender or disability and her examples of how Mr. Brim treated other women are all facially neutral.   (*Id.* at 8-10.)

Fourth, Defendant argues that he is entitled to summary judgment on Plaintiff's retaliation claims (whether the Court applies the standard from *Babb* or the more typical Title VII causation standard) because she has not produced any evidence from which a reasonable factfinder could conclude that she made her harassment complaints with the belief that she was reporting conduct protected by Title VII or the Rehabilitation Act (i.e., that the conduct was based on her gender or disability) and she has not shown a sufficiently hostile work environment following the making of those reports or her request for accommodations that would constitute an adverse action.   (*Id.* at 10-11.)

Fifth, Defendant argues that he is entitled to summary judgment on Plaintiff's failure-to-accommodate claim because (a) Plaintiff has not provided any argument to oppose Defendant's assertion that she does not have a disability as relevantly defined, (b) she has not provided any evidence or authority to show that a new supervisor is a reasonable accommodation, and (c) she does not meaningfully dispute that she retired before the completion of the interactive process and therefore was never actually subjected to a formal denial of the accommodations she requested.   (*Id.* at 11-12.)

## II.   LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[11]   As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

---

[11]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ.

P. 56(a), (c), (e).[12]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that

the motion is to be granted automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Rather, as indicated above, the Court must assure itself that, based on the undisputed material

facts, the law indeed warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v.*

*Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is

lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement.[13]

---

[12]      Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to
the movant's Statement of Material Facts, which admits or denies each of the movant's factual
assertions in matching number paragraphs, and supports any denials with a specific citation to
the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

[13]      Among other things, Local Rule 56.1(b) requires that the non-movant file a response to
the movant's Statement of Material Facts, which admits or denies each of the movant's factual
assertions in matching numbered paragraphs, and supports any denials with a specific citation to

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[14]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Constructive-Discharge and Hostile-Work-Environment Claims

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law.   *See, supra* Parts I.C.1 and 3.   To those reasons, the Court adds the following analysis.

"To prove a hostile work environment claim, 'a plaintiff must establish that the

---

the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[14]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"   *Johnson v. City of Troy*, 20-CV-1279, 2023 WL 2587945, at *5 (N.D.N.Y. Mar. 21, 2023) (D'Agostino, J.) (quoting *Legg v. Ulster Cnty.*, 979 F.3d 101, 114 [2d Cir. 2020]).   "This showing has both objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also 'subjectively perceive that environment to be abusive.'" *Legg*, 979 F.3d at 114 (quoting *Feingold v. New York*, 366 F.3d 138, 150 [2d Cir. 2004]).   "The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective . . . of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target."   *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012). "Factors considered as part of the totality of the circumstances include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance.'" *Johnson*, 2023 WL 2587945, at *5 (quoting *Legg*, 979 F.3d at 114-15.)

A plaintiff must also "demonstrate that the conduct occurred because of his protected status . . . and also that a specific basis exists for imputing the conduct that created the hostile work environment to the employer."   *Johnson*, 2023 WL 2587945, at *5 (quoting *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 [2d Cir. 2020]).   Although facially neutral incidents can be considered as part of the totality of the circumstances, there must be "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."

*Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

As to whether the conduct of Mr. Brim created a hostile work environment, Plaintiff asserts that she perceived the following conduct to be harassing: Mr. Brim subjected her work to extra scrutiny, demeaned and criticized her work, nitpicked small mistakes in her work, called her "unhinged," made sarcastic and snide remarks, yelled at her or spoke to her in an intimidating manner, accused her of harassing Mr. Shearer, asked co-workers about Plaintiff, and "consistently [told] her she was doing things wrong that she was not."   (Dkt. No. 1, at ¶ 26; Dkt. No. 32, Attach. 5, at 130-31, 148-50.)   She additionally testified at her deposition that she felt Mr. Brim subjected her to harassment and bullying through allowing Mr. Shearer to review her work by "not honoring something that was covering a situation where I had been hurt in the past," lied to her about the Mr. Shearer's involvement in reviewing her case, and disregarded her feelings and value as a reviewer. (Dkt. No. 32, Attach. 5, at 87-88, 105.)   Plaintiff further testified that Mr. Sanders harassed her by being rude, rejecting her interim reasonable accommodations suggestions, and thwarting attempts to place her into an interim position that would not cause her stress.   (*See generally,* Dkt. No. 32, Attach. 5, at 151-76.)

However, rudeness and excessive criticism of a plaintiff or her work are not sufficient to establish a hostile work environment.   *See Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (finding that allegations of supervisor making negative statements about plaintiff to others, being impatient and using harsh tones, physically distancing herself from plaintiff, declining to meet with plaintiff, requiring plaintiff to recreate work, replacing plaintiff at meetings, wrongfully reprimanding plaintiff, increasing plaintiff's schedule, and being sarcastic did not rise to the level of a hostile work environment); *Fleming v. MaxMara USA, Inc.*, 371 F.

27

App'x 115, 119 (2d Cir. 2010) (finding that allegations of wrongful exclusion from meetings, excessive criticism of her work, refusal to answer work-related questions, imposition of arbitrary duties, throwing books, and sending rude emails were insufficient to show a hostile work environment); *Kenny v. Catholic Charities Cmty. Servs. Archdiocese of New York*, 20-CV-3269, 2023 WL 1993332, at *21 (S.D.N.Y. Feb. 14, 2023) (noting that "a supervisor's rudeness to an employee does not equate to a hostile work environment under Title VII").   Although Plaintiff argues that Mr. Brim's conduct caused her stress that impacted her ability to concentrate on or physically complete her work, even if a factfinder were to accept as true all of Plaintiff's assertions regarding this conduct, this conduct is simply not so objectively hostile or abusive to rise to the level of severity required to establish a hostile work environment.

Moreover, "[a] case of 'constructive discharge . . . can be regarded as an aggravated case of . . . hostile work environment.'"   *Pistello v. Bd. Of Educ. Of Canastota Cent. Sch. Dist.*, 808 F. App'x 19, 24 (2d Cir. 2020) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 146 [2004]). Because Plaintiff has not shown the existence of conditions as a result of Mr. Brim's conduct that were pervasive or severe enough to constitute a hostile work environment, she has also failed to adduce evidence to support the higher burden on her constructive discharge claims. *See Pistello*, 808 F. App'x at 24 ("Because Pistello failed to show that the School District's actions were severe or pervasive enough to support a claim of retaliatory hostile work environment, she also has failed to show that her 'working conditions [were] so intolerable that a reasonable person would have felt compelled to resign.'"); *accord, Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).

That being said, Plaintiff's deposition testimony regarding the actions of Mr. Sanders

28

during the interactive process suggests an alternative basis for finding the existence of a hostile work environment that requires examination.   Specifically, Plaintiff provided the following testimony: (1) although there was a conference call about her reasonable accommodations request, Plaintiff did not consider it to be a good-faith interactive process; (2) during the conference call with the reasonable accommodations coordinator, Mr. Sanders, and the president of Plaintiff's union, Plaintiff made multiple "very reasonable" suggestions for interim accommodations, including reassignment to Classifications or EPCU or continuing in Mandatory Review with a union intermediary between her and Mr. Brim but Mr. Sanders "just kept saying that's not going to happen"; (3) at the end of the conference call on July 30, Mr. Sanders offered her an interim position to go to a field group, and although she accepted that, he immediately "took it back," only to reoffer the same position later at the second conference in mid-August, which she again accepted; (4) Mr. Sanders did not tell her where the position would be or with what group and she had not even formally accepted that position in writing when Mr. Brim told her to "turn over all [her] stuff" from Mandatory Review and she did not like the manner in which that was done or the way in which she was being treated; (5) after one day in the field agent position, Mr. Sanders "took [her] out of that position"; (6) her former manager, Mr. Boyd, emailed her to inform her that, even before the interactive process had begun or a conference call had been held, Mr. Sanders had intended to make the "temporary" assignment as a field agent permanent, and that such reassignment was "all [she is] going to get"; (7) her new manager, Mr. Waters, also told her that the reassignment to the field group was permanent; and (8) she finalized her retirement after she was again placed back in the field agent position but was provided with assignments that required extensive travel.   (Dkt. No. 32, Attach. 5, at 155-59,

164-77.)   She acknowledges that the interim accommodation was to be for the six weeks before

the FOH assessment was expected to be completed, and that she would have been able to apply

for any vacancies for open positions if the FOH found she was entitled to reassignment, whether

or not the field agent position had been made permanent.   (*Id.* at 157-58, 173.)   In her EEO

investigative affidavit, Plaintiff further stated that Mr. Sanders "refused all of [her suggestions

for interim accommodations] stating he did not have the authority to do them" and that he lied

about an open position in Classifications being unavailable for her.   (Dkt. No. 32, Attach. 8, at

11-12.)

By contrast to Plaintiff's testimony, the deposition testimony of Mr. Sanders indicates the

following: (1) he had no involvement in the decision to assign Plaintiff to Mr. Waters' group or

in the work that she was assigned when she was transferred to that group; (2) Plaintiff accepted

the field agent position when it was offered to her, but it was "pulled from her based upon the

decision made by the [reasonable accommodations coordinator] until the FOH report was

received" based on an email from Plaintiff, and she was placed back into Mandatory Review; (3)

the assignment to the field group position was an interim one; (4) he did not look into an open

position in Classifications because "I couldn't do anything of that nature. I would have to wait

for the [reasonable accommodations coordinator] or the FOH report to come back before we

could do something like that"; and (5) he was not the deciding official on her reasonable

accommodation request.   (Dkt. No. 32, Attach. 7, at 34-35, 40-41, 45-49.)   Further, in the EEO

affidavit of Ms. Minters, the reasonable accommodations coordinator, she stated that (1) the

suggestion of moving Plaintiff to the field agent position as an interim accommodation was made

by Mr. Sanders during a meeting on August 15, which was formally offered to Plaintiff on

August 18, and which she accepted; (2) Plaintiff informed Ms. Minters on that same day that she "felt her health maybe [sic] harmed with [the] interim accommodation, such that Ms. Minters and management agreed that it would be better to wait until the FOH report returned; and (3) by the time the FOH report was returned on September 25, Plaintiff had already put in her retirement for September 29.   (Dkt. No. 32, Attach. 30, at 5-6.)   Meeting notes from the July 31 conference call (as memorialized in an email to the participants) document that, during that initial call, Mr. Sanders stated that he could not move Plaintiff to Classifications or EPCU because "he has no control over" those groups and instead suggested a position as a revenue agent; at that time Ms. Minters indicated she wanted to request an FOH assessment.   (Dkt. No. 32, Attach. 39, at 2-3.)

In an email dated August 1, 2018, the day after that call, Mr. Sanders emailed Ms. Minters requesting the minutes and stating that "[a]fter further consideration, I'm not in favor of placing Linda back in the field as a temporary or long-term solution based on her comments about not being able to drive long term and how the medicine impacts her driving."   (Dkt. No. 32, Attach. 40, at 4-5.)   However, after clarification from Plaintiff that she was not limited in her ability to drive short or long distances, on August 13, 2018, Mr. Sanders told Ms. Minters that he was "fine" with offering Plaintiff a "temporary accommodation as a Revenue Agent in the Northeast Area until further guidance is received from the FOH report."   (Dkt. No. 32, Attach. 39, at 2; Dkt. No. 32, Attach. 40, at 2.)   In an email dated August 17, 2018, Mr. Sanders stated that "[p]er our conversation on Wednesday, August 15, 2018, you've accepted the temporary interim accommodation to be reassigned to the Northeast Area as a field agent.   You will be reporting to Mitchell Waters, Group 7609, with an effective date next Monday, August 20,

2018," to which Plaintiff responded, "Thank you Mike. Everything is in the mail!"   (Dkt. No. 32, Attach. 41, at 2.)   However, on that same date, Plaintiff sent multiple emails, including two to Mr. Waters, in one of which she stated, "I guess I will be filing my retirement papers. . . . It would be stupid to waste your time and the Services['] time and money to start a job that I will not stay in," and then had a phone call with Mr. Waters, in which he noted she reemphasized her plans to retire, but he told her he was looking forward to working with her and suggested they talk more the following week.   (Dkt. No. 32, Attach. 45, at 2; Dkt. No. 32, Attach. 46, at 2.)   In another email to Mr. Waters on August 18, 2018, Plaintiff stated that she had not formally agreed to the interim assignment at the time Mr. Sanders stated she had, that she had no idea if that position "is meant to be a permanent change or not," and that she has no desire to be a field agent again, both because of her career goals and her health concerns.   (Dkt. No. 32, Attach. 47, at 2-3.)   Then, in light of emails she received from Plaintiff, Ms. Minters told Mr. Sanders on August 21, 2018, that she recommended that "the interim temporary accommodation to a Revenue Agent position may not be an effective accommodation and may need to be on hold or pull [sic] until the FOH report is returned."   (Dkt. No. 32, Attach. 48, at 2.)   On August 22, 2018, Mr. Sanders informed the relevant individuals that Plaintiff would be staying in her position as a Mandatory Reviewer and continue to report to Mr. Brim.   (Dkt. No. 32, Attach. 49, at 2.)   The same day, Plaintiff informed Mr. Brim, Mr. Sanders, and Ms. Minters that "I will be off for the next week on medical leave and then I am done."   (Dkt. No. 32, Attach. 50, at 2.)   On August 30, 2018, Defendant again offered an interim accommodation to Plaintiff as a field agent in Mr. Waters' group, which Plaintiff accepted with her signature on the same date.   (Dkt. No. 32, Attach. 54, at 2.)   Plaintiff submitted her retirement on September 12, 2018, with an

effective date of September 29, 2018.   (Dkt. No. 32, Attach. 55, at 3-4.)

Although there certainly are issues of fact given the difference between Plaintiff's testimony and the other evidence regarding when certain events happened or who initiated them, the Court finds that such issues do not prevent the granting of this motion.   Specifically, even if a factfinder were to accept that it was Mr. Sanders rather than Ms. Minters who made the choice to withdraw the temporary assignment in mid-August (or that he had intended such assignment to be permanent), the evidence does not support a finding that these actions rose to the level of a hostile work environment.   Importantly, Mr. Sanders' refusal to accept Plaintiff's suggestions for various temporary accommodations did not change the terms or conditions of her employment; those circumstances instead remained entirely the same, and the Court has already found that the conditions of her Mandatory Review work do not amount to a hostile work environment.

Further, as to the first reassignment to Mr. Waters' group, although there appears to be some dispute as to whether Plaintiff formally accepted that reassignment (Plaintiff herself testified at her deposition that she did accept it contrary to her emails from the relevant time), it is undisputed that she was removed from that position after a day and returned to Mandatory Review based on her own communications with her union representative, Mr. Waters, and Ms. Minters in which she expressed apprehension about that position being good for her health. (*See e.g.*, Dkt. No. 32, Attach. 46; Dkt. No. 32, Attach. 47; Dkt. No. 32, Attach. 48; Dkt. No. 32, Attach. 53.)   Removing her from that position in an effort to address her own stated concerns can hardly be considered to be abusive or offensive, especially as, again, the conduct to which she was being subjected in the Mandatory Review position does not rise to the level of a hostile

work environment, as discussed above.   However, she then accepted the same position again on August 30, 2018, choosing to be in that position rather than staying in Mandatory Review. (Dkt. No. 32, Attach. 54, at 2.)   Plaintiff offers no evidence to support any speculation that Mr. Sanders had control over the work she was assigned in that field agent position (which undisputedly was in a different area under a different manager), and the other evidence instead clearly establishes that he did not.   (Dkt. No. 32, Attach. 7, at 34-35.)   These circumstances simply do not rise to the level of a hostile work environment, particularly because her assignment to the field agent position was, before the time the FOH report was completed, undisputedly temporary in nature (given that a favorable FOH determination would have entitled her to other options), whether Plaintiff believed it to be or not at the time.

Moreover, and perhaps more importantly, notwithstanding any possible genuine dispute of material fact regarding the impact of Mr. Sanders' conduct, Plaintiff's claims for hostile work environment and constructive discharge fail because there has been no evidence produced to raise a genuine dispute of material fact as to whether the allegedly harassing conduct was in any way related to or motivated by either her gender or disability.   As to Mr. Brim, Plaintiff testified multiple times that it appeared women in the group were treated worse than men, that "it was the women in our group that he was upsetting and picking on," and that he was simply more respectful and considerate of male employees, providing a few examples where Mr. Brim made female employees cry or overly stressed as a result of his conduct towards them.   (Dkt. No. 32, Attach. 5, at 62-64, 69-83, 90-91.)   However, she also testified that Mr. Brim had been "aggressive" to the whole group on their first call (a group that also included male employees), that there was a belief among the group that Mr. Brim's objective was to get rid of the

34

Mandatory Review group altogether, that she did not know whether Mr. Brim had written similar comments on reviews of work by men but rather only that she did not believe he would, and that Mr. Brim had not made any overt misogynistic, sexist, or derogatory remarks regarding women, but that her perception of how women were treated made her believe that his conduct towards her was based on her gender.   (Dkt. No. 32, Attach. 5, at 62-64, 69-83, 90-91, 114, 125.)   As to Mr. Sanders, Plaintiff testified at her deposition that she knew from others that Mr. Sanders "hasn't been nice to a lot of people," that he's "done a lot of things to people," that he has a reputation as a "bully," that he intimidated, yelled at, and made another female employee cry such that she filed a grievance against him and had to be moved from under his supervision, and that he threatened to withhold a future promotion from another female employee unless she refrained from doing something he did not want her to do.   (Dkt. No. 32, Attach. 5, at 34-35, 40-42.)

       As can be seen from the record evidence, Plaintiff's assertions of gender bias are based primarily on conduct that is entirely facially neutral, and she has offered nothing other than her own belief based on her own perception and a few anecdotes from four female coworkers that Mr. Brim and Mr. Sanders treated women worse than men.   Yet Plaintiff also admits that Mr. Brim was aggressive with all members of the Mandatory Review group on one call and that she has no knowledge of what his review comments for the work of male employees was like.   A subjective belief or feeling based merely on personal perception that conduct is rooted in a protected category is insufficient to sustain a hostile work environment claim.   *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 120 (S.D.N.Y. Sept. 27, 2022) (noting that "it is well established that [a] plaintiff's feelings and perceptions of being discriminated against are not

evidence of discrimination" and finding that the plaintiff offered nothing but conclusory assertions that race-neutral incidents somehow showed that those incidents occurred because of her protected characteristics) (internal quotation marks omitted) (collecting cases); *Joseph v. New York City Dep't of Corrs.*, 10-CV-1265, 2011 WL 1843162, at *8 (E.D.N.Y. May 13, 2011) ("Joseph's subjective feelings of discrimination, unattached from any inference that his employers discriminated against Haitians, does not make out a hostile work environment claim against Defendants.").   Further, she offers nothing but speculation and conclusory assertions that continued harassment by Mr. Brim and Mr. Sanders was intended to cause her stress as a means of worsening her disabilities so that she would retire.

Because there is no material evidence to support Plaintiff's assertion that the relevant conduct was because of her gender and/or disability, no reasonable factfinder could conclude that she was subjected to a hostile work environment under either Title VII or the Rehabilitation Act, and therefore her claims related to both hostile work environment and constructive discharge must be dismissed.   *See Buczakowski v. Crouse Health Hosp., Inc.*, 18-CV-0330, 2019 WL 6330206, at *8 (N.D.N.Y. Nov. 26, 2019) (Kahn, J.) (noting that, like a hostile work environment claim, a constructive discharge claim also requires a showing that the discharge occurred under circumstances giving rise to an inference of discrimination based on a protective characteristic); *accord, Shim-Larkin v. City of New York*, 16-CV-6099, 2023 WL 6519581, at *12-13 (S.D.N.Y. Aug. 18, 2023).

For all of the alternative above-stated reasons, the Court grants summary judgment to Defendant on Plaintiff's First, Fourth, Fifth, and Sixth Claims that are premised on a hostile work environment and/or constructive discharge.

### B.    Whether Defendant Is Entitled to Summary Judgment on Plaintiff's

**Retaliation Claims**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law, *see, supra* Parts I.C.1 and 3.   To those, the Court adds the following reasons.

Plaintiff also asserts claims of retaliation under both Title VII and the Rehabilitation Act related to the same conduct by Mr. Brim (to the extent of his behavior towards her after she complained about his treatment and filed a grievance against him) and Mr. Sanders that forms the basis for her hostile-work-environment and constructive-discharge claims.   To establish a prima facie case of retaliation under both Title VII and the Rehabilitation Act, a plaintiff must show that "(1) she was 'engaged in protected activity' under the law supporting her claim; (2) 'the employer was aware of that activity;' (3) the employee suffered a 'materially adverse action'; and (4) there was 'a causal connection between the protected activity and that adverse action.'"   *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 543 (N.D.N.Y. 2021).   An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Sears-Barnett*, 531 F. Supp. 3d at 543 (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 [2d Cir. 2014]). Requests for accommodations for a disability is considered a protected activity.   *Sears-Barnett*, 531 F. Supp. 3d at 544.

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Croons v. New York State Office of Mental Health*, 18 F. Supp. 3d 193, 208 (N.D.N.Y. 2014) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 [2d Cir. 2013]).   "If the employer

demonstrates a legitimate, nondiscriminatory reason, then 'the burden shifts . . . back to the

plaintiff to establish, through either direct or circumstantial evidence, that the employer's action

was, in fact, motivated by discriminatory retaliation.'"   *Croons*, 18 F. Supp. 3d at 208 (quoting

*Summa*, 708 F.3d at 125).

The Court agrees with Defendant that Plaintiff has not established that her harassment

complaint against Mr. Brim and Mr. Sanders related to their conduct surrounding the review of

her 30-day packet constitutes protected activity of which Defendant would have been aware,

because there is no evidence to even raise a genuine dispute of material fact regarding whether

such complaint was made with a reasonable belief that it was challenging conduct prohibited by

Title VII or the Rehabilitation Act.   *See Wright v. Martin, Harding and Mazzotti, LLP*,

22-CV-0515, 2022 WL 19795849, at *4 (N.D.N.Y. July 19, 2022) (Lovric, M.J.) (noting that, to

sustain a claim for retaliation, a plaintiff must show that "she possessed a good faith, reasonable

belief that the underlying employment practice was unlawful under [the relevant statutes]); *see*

*also Notofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (finding challenges to

demotion insufficient to substantiate protected activity because those challenges did not include

anything to indicate the plaintiff was protesting the action as being based on discrimination).

Plaintiff herself admits that she does not know whether Mr. Brim's review and conduct were

based on her gender or disability; she has stated that she did not believe at the time she received

the 30-day review from Mr. Brim that it was related to her gender (and indeed there were

concerns among the Mandatory Review group at that time that Mr. Brim had been sent to get rid

of all of the members of the group), that she cannot provide any evidence that she believed any

conduct by Mr. Sanders was based on her protected characteristics, and that she only came to

speculate regarding the basis of their conduct later.   (Dkt. No. 32, Attach. 5, at 69-72, 114.)

Indeed, her emails leading up to the filing of the harassment complaint discuss in great detail her

feelings regarding Mr. Brim's decision to disregard the review arrangement she had with Mr.

Boyd previously, but nothing in those emails even suggests that she believed any of the relevant

conduct was related to her gender or disability; rather, she specifically states she believed it

violated the IRS' policies regarding general workplace bullying and harassment, not Title VII or

the Rehabilitation Act.   (Dkt. No. 32, Attachs. 18, 20, 22, 25.)   Nevertheless, Plaintiff's later

request for accommodations related to her disability does constitute sufficient protected activity

to sustain her claim pursuant to the Rehabilitation Act because it is undisputed that such request

was based on Plaintiff's reasonable belief that she was asserting a need for accommodations for

her medical conditions that was protected by law.

Defendant argues also that Plaintiff has not established that she suffered any legally

sufficient adverse employment action because the allegedly harassing conduct did not change the

terms or conditions of her employment, even if they caused her stress, for the same reasons that

her hostile work environment and constructive discharge claims are insufficient.   (Dkt. No. 32,

Attach. 1, at 19-20.)   This argument is persuasive as to Mr. Brim's conduct, no portion of which

materially altered the conditions of her employment.   *See Ziyan Shi v. New York Dep't of State,*

*Division of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (finding an increase in

workload that was not heavily disproportionate to similarly situated employes, the issuance of a

counseling memorandum without any other adverse consequence, yelling and screaming at

plaintiff, and failing to include him on an email all did not constitute adverse actions).

It is also persuasive as to Mr. Sanders' conduct throughout the interactive review process,

namely denying her requests to be moved to Classifications or EPCU (or other suggestions that would have made her time in mandatory review more tolerable) as an interim accommodation and instead having the only reassignment option offered be a field agent position in Mr. Waters' group, and rescinding that accommodation in mid-August before offering it again in late August. Although Plaintiff testified that she believes that it was Mr. Sanders who rescinded the offer of that position after the first time she accepted in in mid-August in an effort to harass and retaliate against her, the other evidence substantiates that it was Ms. Minters in her capacity as the reasonable accommodations coordinator that recommended that Plaintiff be removed from the field agent reassignment as a result of Plaintiff's own emails expressing her dissatisfaction and concerns about her ability to perform such position in light of her medical impairments.   (Dkt. No. 32, Attach. 48, at 2.)   Plaintiff's unsubstantiated belief that not only was Mr. Sanders solely responsible for that decision but also that he did so to harass her is insufficient to create a genuine dispute of material fact.   Further, regarding the second reassignment to that position at the end of August 2018, although the reassignment did materially alter the terms and conditions of her employment in that she was being made to do different duties (some of which, like the expected travel to locations across the country to conduct case audits) could be considered to be significantly disadvantageous to Plaintiff, it is undisputed that Plaintiff was not required to accept that reassignment as an interim accommodation, and was indeed counseled by her union representative that she did not need to accept that if she did not want it.   (Dkt. No. 32, Attach. 45, at 2.)   Although it is true that "[a] plaintiff who voluntarily transfers is not precluded from establishing a prima facie case of retaliation . . . she may face a higher bar in doing so," and must show that the transfer amounted to a constructive discharge.   *Mulligan v. Town of Hempstead*,

21-CV-0964, 2024 WL 84829, at *8 (E.D.N.Y. Jan. 8, 2024) (citing *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 444 [2d Cir. 1999]; *Chanval Pellier v. British Airways, Plc.*, 02-CV-4195, 2006 WL 132073, at *5 [E.D.N.Y. Jan. 17, 2006]; *Davis v. New York State Dep't of Corrs., Attica Corr. Facility*, 46 F. Supp. 3d 226, 236 [W.D.N.Y. 2014]).   Because the Court has already found that the conditions of her work surrounding both Mandatory Review and the field agent position do not rise to the level of a hostile work environment or a constructive discharge, Plaintiff has not shown that the temporary reassignment, which she voluntarily accepted rather than remaining in Mandatory Review while the FOH assessment was ongoing, was an adverse action.

For the above reasons, the Court grants summary judgment to Defendant on Plaintiff's Second and Third Claims.

### C.   Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Failure-to-Accommodate Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra* Parts I.C.1 and 3.   To those reasons, the Court adds the following analysis.

Failure-to-accommodate claims brought under the Rehabilitation Act are subject to the same definition of an "individual with a disability" and same prima facie standard as claims brought under the Americans with Disabilities Act ("ADA").   *Tull v. New York City Housing Auth.*, 722 F. App'x 75, 77 (2d Cir. 2018) (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 53 [2d Cir. 2002]).   To state a prima facie case for failure to accommodate, a plaintiff must show that (1) she is a person with a disability under the meaning of the Rehabilitation Act, (2) her employer was both covered by that statute and had notice of her

disability, (3) she could perform the essential functions of the job at issue with reasonable

accommodation, and (4) her employer has refused to make such accommodations.   *Bey v. City*

*of New York*, 999 F.3d 157, 165 (2d Cir. 2021) (quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d

89, 94 [2d Cir. 2015]).

      Defendant argues that Plaintiff cannot establish the requirements of this claim because (1)

the undisputed evidence fails to show that she had a disability as defined under the Rehabilitation

Act, (2) her request for a new supervisor was not a reasonable accommodation, and (3)

Defendant did not actually deny her request for accommodation given that Plaintiff chose to

retire before the completion of the interactive process.   (Dkt. No. 32, Attach. 1.)

      As to whether Plaintiff has a qualifying disability for the purposes of her asserted claim,

the Second Circuit recently reiterated that, under the ADA, a condition that is alleged to

substantially limit the major life activity,[15] which in this case is most properly that of working,

must do more than leave the plaintiff "unable to perform only a single, specific job" or *work*

*under a specific supervisor*, but rather must instead "affect[] the ability to 'perform a class . . . or

---

[15]     The relevant statute defines "major life activities" as activities such as "caring for
oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,
bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and
working."   42 U.S.C. § 12102(2)(A).   A major life activity can also include "the operation of a
major bodily function, including but not limited to, functions of the immune system, normal cell
growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and
reproductive functions."   42 U.S.C. § 12102(2)(B).   The only of these listed activities that
appears implicated in this case (other than working) is the function of Plaintiff's immune system,
as her medical impairments are autoimmune disorders that are exacerbated by stress.   (Dkt. No.
1, at ¶ 39.)   However, consideration of that major life activity would not constitute a disability
under the circumstances for the same reasons that will be discussed below related to the major
life activity of work, namely because (a) the accommodation was sought only in the context of
enabling her to perform her job without an undue exacerbation of her symptoms, and (b) it was
the stress caused by her specific supervisor that caused the symptoms of her medical
impairments to manifest; she admits that she did not experience symptoms of immune-system
impairment at a level that required any accommodations in the performance of her work other
than when she was subjected to the stress of being supervised by Mr. Brim.   (Dkt. No. 32,

broad range of jobs.'"   *Woolf v. Strada*, 949 F.3d 89, 93-95 (2d Cir. 2020) (quoting 29 C.F.R. §

1630) (emphasis added).   Although this case was decided related to the ADA, as was discussed

above, the standards regarding who qualifies as an individual with a disability is the same under

the ADA and under the Rehabilitation Act.   *See Freeman v. Kirisits*, 818 F. App'x 34, 40 (2d

Cir. 2020) (noting that the Rehabilitation Act defines the term "individual with a disability" by

reference to the ADA, and applying the holding of *Woolf* to a claim under the Rehabilitation Act

as to his ability to work); *accord Thomas v. New York State Off. for People With Developmental

Disabilities*, 21-CV-6577, 2024 WL 641266, at *4-5 (W.D.N.Y. Feb. 15, 2024).

Here, Plaintiff was seeking to be accommodated related to her alleged inability to

perform her position as a Senior Mandatory Reviewer as a result of the stress (which exacerbated

her underlying medical conditions) caused by Mr. Brim's actions as her supervisor.   She does

not provide any evidence showing that the work she was performing caused her symptoms or

difficulties, only Mr. Brim's actions; in fact, she admits that she did not experience significant,

work-impacting difficulties that required accommodation under her previous supervisor, but

rather that the need for accommodation arose when Mr. Brim became her supervisor and

reviewed her assignment with the assistance of Mr. Shearer, thus starting the alleged harassment.

(Dkt. No. 32, Attach. 56, at 4.)   She also has stated that she could perform that same work if she

was permitted to do it in another department under a different supervisor, or that she would be

capable of performing a similar type of claim-review work for other departments.   Because

Plaintiff was able to perform her job as a Senior Mandatory Reviewer despite her medical

conditions, and it was only having to work with Mr. Brim as a supervisor that rendered her

unable to perform the demands of that job, Plaintiff cannot show that she is an "individual with a

---

Attach. 56, at 4.)

disability" based on the principle in *Woolf*.   *See Freeman*, 818 F. App'x at 40 (finding the

plaintiff had not sufficiently alleged he was substantially limited in the major life activity of

work because his allegations of being disabled applied to work only in the E1 unit due to the

"loud and noisy atmosphere" of that unit); *Thomas*, 2024 WL 641266, at *5 (finding the plaintiff

did not have a disability under the Rehabilitation Act for a failure-to-accommodate claim

because her PTSD symptoms limited her from working only specifically at one group home, but

nowhere else).

        Moreover, as to whether Plaintiff was denied an accommodation, the Court notes that it is

undisputed that Defendant began the interactive process and held multiple conferences with

Plaintiff regarding potential interim accommodations while it was waiting for the FOH

assessment to be completed.   That Plaintiff was offered and accepted an interim accommodation

that was other than the ones she requested does not transform Defendant's actions into a denial

of accommodations altogether, particularly because such interim accommodation was intended

only to be a stop-gap until the FOH assessment was completed, and was not a final decision on

Plaintiff's accommodation request.   It is undisputed that, dissatisfied with the interim

accommodation offered and with Defendant's actions, Plaintiff announced her intent to retire

from employment with Defendant before the FOH assessment was completed.   "[A]n employee

who withdraws from the interactive process cannot later allege failure to accommodate."   *Noel

v. BNY-Mellon Corp.*, 10-CV-9143, 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011); *see also

Maira v. Sti-Co Indus., Inc.*, 20-CV-0447, 2021 WL 1229598, at *8 (W.D.N.Y. Feb. 24, 2021),

adopted by 2021 WL 1226431 (W.D.N.Y. Mar. 31, 2021) ("An employee who is responsible for

the breakdown in the interactive process may not later assert a claim for a failure to

accommodate."); *Durick v. New York City Dep't of Educ.*, 202 F. Supp. 3d 277, 290 (E.D.N.Y. 2016) (noting that "Plaintiff cannot unreasonably discontinue a process through which she could have been accommodated and then use the abandoned request as the basis for a failure to accommodate claim" in a situation where, during the interactive process, the plaintiff "abandoned [her] request by failing to attend the medical examination [which was part of the interactive process] and instead choosing to retire two days later").

To the extent that Plaintiff argues that it was Defendant who first acted in bad faith and broke the interactive process, this argument fails for two reasons.   First, Plaintiff's characterization of the attempts to be moved to another position within the IRS as being an attempt to frustrate the interactive process is not consistent with the undisputed record, which, as was discussed extensively above related to Plaintiff's hostile-work-environment claims, shows that, not only did Plaintiff accept the offered interim accommodation of reassignment of a field agent position (despite being informed by her union representative that she was not required to accept it), but Defendant continued to work with her by removing her from that reassignment after she expressed health concerns related to the reassignment to multiple individuals, and then again offered her that reassignment when she later reasserted a need to not be in Mandatory Review pending the outcome of the FOH assessment, an offer which Plaintiff again accepted. That Defendant did not provide Plaintiff with one of the specific interim accommodations she requested while waiting for the FOH assessment does not render its attempts to accommodate her disability bad faith.   Second, even if there was anything disingenuous in providing Plaintiff with a temporary transfer to a field agent position rather than one of her requested interim accommodations, that temporary transfer was not the end of the interactive process.   Rather, the

matter was referred for an FOH assessment to determine whether and/or what accommodations were warranted under the circumstances.   It was Plaintiff who chose to submit her retirement paperwork and inform Defendant that she was retiring at the end of September 2018 before the FOH assessment was completed based on her belief that the reassignment would be permanent, despite the fact that she also admitted at her deposition that a favorable FOH determination would have entitled her to apply for other open positions.   Given that there is no evidence to substantiate a finding that the external FOH assessment was somehow biased, unfair, or predetermined, Plaintiff's choice to submit her retirement paperwork before the completion of the interactive process and any actual denial of her request for accommodation represents a withdrawal from the interactive process and renders her failure to accommodate claim invalid.[16]

For all of these reasons, the Court grants summary judgment to Defendant on Plaintiff's Seventh Claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 32) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

---

[16] This is the case even though the FOH assessment ultimately concluded that the difficulties Plaintiff experienced with Mr. Brim were a personnel matter rather than a disability matter.   There is no evidence to suggest that the outcome of that assessment was predetermined, or that Plaintiff had any reason to believe that the FOH assessment would find as it did such that she would have reasonably believed that continuing with the process would have been futile. Nor does the fact that the FOH assessment results were provided a few days before her retirement actually became effective alter the Court's conclusion, because Plaintiff had made clear to various management personnel and the members of the Mandatory Review team at various times throughout August and September 2018 that she was not intending to continue working for Defendant due to her dissatisfaction with the interim accommodations, and the official retirement process had begun by September 12, 2018, approximately two weeks before

Dated: March 28, 2024
Syracuse, New York

Glenn T. Suddaby
U.S. District Judge

the results of the FOH assessment.   (Dkt. No. 32, Attachs. 45, 46, 47, 50, 51, 55.)

47